# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

DEANNE G. BEITO,

                              Civil No. 13-555 (JRT/JSM)

                    Plaintiff,

                                   **MEMORANDUM OPINION**
v.                                **AND ORDER DENYING**
                                 **DEFENDANT'S MOTION FOR**
WESTWOOD PLACE, INC.,              **SUMMARY JUDGMENT**

                    Defendant.

Matthew H. Morgan and Brock J. Specht, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Amy C. Taber, **BARNES & THORNBURG LLP**, 225 South Sixth Street, Suite 2800, Minneapolis, MN 55402, for defendant.

Plaintiff Deanne Beito brings this action against her former employer Westwood Place, Inc. ("Westwood") alleging that Westwood threatened to discharge and did discharge her for seeking workers' compensation benefits in violation of Minn. Stat. § 176.82, subd. 1. Beito also alleges that Westwood discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01, *et seq.* Westwood moves for summary judgment on all of Beito's claims. Because material issues of fact remain as to whether Westwood threatened to terminate Beito in a manner that caused her to cease seeking workers' compensation benefits, whether Westwood terminated Beito in retaliation for filing a workers' compensation

claim, and whether age was a determinative factor in her termination, the Court will deny Westwood's motion in its entirety.

## BACKGROUND

## I.     WESTWOOD'S OPERATIONS

Westwood is a licensed assisted living facility in Watertown, Minnesota.  (Third Decl. of Cristina Parra, Ex. 22 (Dep. of Michael J. Gorra ("M. Gorra Dep.") 27:23-28:7), Jan. 13, 2014, Docket No. 39.)  Westwood offers a broad array of services to its senior residents including meals, room and board, housekeeping, medical assistance, nursing services, and assistance with daily living tasks.  (Third Parra Decl., Exs. 20-21 (Dep. of Deanne Beito ("Beito Dep.") 58:21-59:5).)[1]

Michael Gorra ("Mike") is the owner and president of Westwood, and his son, Richard Gorra ("Rick") is the vice president.  (M. Gorra Dep. 10:17-19; Third Parra Decl., Ex. 23 (Dep. of Richard Gorra ("R. Gorra Dep.") 23:22-24).)  Mike is responsible for maintenance of Westwood's building and is typically present at the facility at least once per week.  (M. Gorra Dep. 75:8-17, 82:2-14; R. Gorra Dep. 24:10-12.)  Rick works in Westwood's main office and is responsible for maintaining insurance, paying bills, collecting checks, and doing minor maintenance.  (R. Gorra Dep. 22:23-23:21.)  Rick is typically present at the facility once per week.  (*Id.* 23:11-13, 24:4-9.)  The Gorras'

---

[1] Beito's first deposition was taken on July 31, 2013, and appears as Exhibit 20 to the Third Declaration of Cristina Parra.  A second deposition was taken on October 15, 2013, and appears as Exhibit 21 to the Third Parra Declaration.  The two depositions are consecutively paginated and will be referred to collectively in this Order as "Beito Dep."

primary function is to "oversee that everything goes smoothly" at Westwood.  (*Id.* 23:25-24:7.)

## II.    BEITO'S MANAGER POSITION

Beito was hired as a floor aide for Westwood in 1988 when she was forty-six years old.  (Beito Dep. 14:14-15:6, 20:21-23.)  One year later, Mike promoted her to the position of assistant manager.  (*Id.* 15:22-16:6.)  Six months later, Mike promoted Beito into the manager position that she held until her termination on July 23, 2012.  (*Id.* 18:15-21, 19:21-20:20.)  During the course of her employment, Beito regularly received year-end bonuses, including a bonus in 2011.  (M. Gorra Dep. 92:21-94:1.)

Beito's duties as manager encompassed supervising nearly all day-to-day operations at Westwood.  (Beito Dep. 21:8-15.)  Among other duties, Beito hired, trained, supervised, disciplined, and fired employees; oversaw payroll and employee leave; wrote and implemented policies and procedures for Westwood; oversaw compliance with applicable state and local regulations for assisted living facilities; oversaw building operations and maintenance; collected rent from residents and handled billing for services; addressed resident complaints; gave tours to prospective residents and marketed the facility; and acted as a liaison between Westwood and outside care and service providers.  (*Id.*; Third Parra Decl., Exs. 1-2.)

Because Beito's duties and her ability to adequately perform them form a critical part of the present motion, this Order briefly recounts here the duties and responsibilities of other employees that overlapped to some extent with Beito's described managerial responsibilities.  Westwood has approximately thirty employees that were under Beito's

supervision. (R. Gorra Dep. 55:17-56:3; Beito Dep. 22:17-23; *see also* Third Parra Decl.,

Ex. 1 at 2.)[2]  Westwood employs a bookkeeper who is responsible for recording and

depositing resident rent, managing payroll, and maintaining a list of overdue accounts

that she discusses with the manager or caretakers. (R. Gorra Dep. 30:15-31:15.)  Rick

testified that the bookkeeper would discuss overdue accounts with him approximately

once each month. (*Id.* 28:2-29:15.)  Additionally, during the last nine years of Beito's

employment, Westwood employed Donna Lehrke as a registered nurse. (Aff. of Donna

Lehrke ¶¶ 2-3, Jan. 13, 2014, Docket No. 38.)[3]  Lehrke was responsible for, among other

---

[2] With the exception of depositions, all references to page numbers of exhibits refer to the CMECF pagination.

[3] Westwood appears to object to the admission of the Lehrke Affidavit.  In its reply brief, Westwood argues that "[p]ortions of Lehrke's affidavit make improper statements and fail to satisfy the requirements of Rule 56(c)(4).  For brevity purposes, this affidavit offers inadmissible hearsay, opinion and conclusory statements.  Consistent with the dictates of Rule 56, the Court should not consider those portions of Plaintiff's memorandum relying on this affidavit." (Reply at 2, Jan 23, 2014, Docket No. 40.)  Westwood identifies no specific portion of the affidavit that it believes offers inadmissible evidence, nor has it explained how any opinion or conclusory statements contained in the affidavit render it inadmissible under Federal Rule of Civil Procedure 56. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); Fed. R. Evid. 701(a) (providing that a lay witness may testify in the form of an opinion if the opinion is "rationally based on the witness's perception").  In her affidavit, Lehrke describes her position and the duties of her employment at Westwood and offers testimony as to her opinion about Beito's job performance, based upon her experience working with Beito for nine years. (Lehrke Aff. ¶¶ 2-3, 5-7.)  Lehrke also offers testimony about common practices among staff members in cases of problems (*id.* ¶¶ 8-11), the frequency with which Beito answered telephone calls while at work (*id.* ¶¶ 12-13). billing procedures for assisted pay clients (*id.* ¶¶ 14-15), her own experiences using Lifestyle Ledger software (*id.* ¶¶ 16-22), the typical practices at Westwood regarding use of a Wanderguard system (*id.* ¶¶ 23-26, 28), and general practices regarding resident diets (*id.* ¶ 27).  All of this proffered testimony is based upon Lehrke's personal knowledge gained while working at Westwood.  Furthermore the testimony offered is not hearsay, as it does not relate to out of court statements, but instead discusses common practices and specific experiences Lehrke had while employed at Westwood. *See* Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered "to prove the truth of the matter asserted

(Footnote continued on next page.)

tasks, "checking doctors' orders, giving medications to residents, updating resident charts, visiting and addressing concerns with residents and family of residents and supervising staff." (*Id.* ¶ 6.)

## III.   BETA-TESTING OF LIFESTYLE LEDGER

In July 2011, Westwood entered into a Beta Site Testing Agreement ("the Agreement") with Joyful, Inc., owned by Mike's then-girlfriend, now-wife, Joy Melby, to implement and test a software program designed by Melby.[4] (Third Parra Decl., Ex. 6; M. Gorra Dep. 151:11-18.)  The internet-based "Lifestyle Ledger" program was intended to make administrative paperwork more efficient in order to allow nurses to spend more time with residents and therefore "assist in bringing better harmony" to assisted living facilities, creating "a happier client, more efficient staff, [and] maybe happier staff because [they] have a better communication tool."  (Third Parra Decl., Ex. 24 (Dep. of Joy Melby ("Melby Dep.") 49:6-24, 51:21-52:10).)

_____
(Footnote continued.)

in the statement").  Although some of the testimony in the Lehrke Affidavit offers opinions (*see, e.g.*, Lehrke Aff. ¶ 22 ("The computer system still seemed unreliable and I was never sure if the system would crash or how easily it could be hacked into.")), this opinion testimony is rationally based on Lehrke's personal first-hand knowledge of the Lifestyle Ledger software and the specific problems she encountered during her use of it and would therefore be admissible. Because Westwood has not even attempted to identify any portion of the Lehrke Affidavit that is inadmissible, and the affidavit complies with the requirements of Federal Rule of Civil Procedure 56(c)(4), the Court considers the evidence offered in the affidavit in resolving the present motion.

[4] From 1997 through 2008 Melby managed an assisted living facility owned by the Gorras in Northfield, Minnesota.  (Third Parra Decl., Ex. 24 at 14:2-10.)

The primary purpose of the beta testing was "to obtain feedback on Joyful, Inc., Lifestyle Ledger application features, performance and functionality, and to identify any defects or inconsistencies in functionality." (Third Parra Decl., Ex. 6 at 2.) The Agreement advised Westwood "to safeguard important data, to use caution and not to rely in any way on the correct functioning or performance of the software and/or accompanying materials." (*Id.*) Westwood further agreed not to "rely exclusively on the software for any reason," and Joyful, Inc. waived all liability arising out of the beta testing. (*Id.*, Ex. 6 at 3.) The beta testing period was originally intended to last ninety days but was extended several times. (*Id.*, Ex. 6 at 2.)

Early in the beta testing, Melby met with Westwood staff and informed them that all resident records were going to be loaded into Lifestyle Ledger, and updated using that system. (Beito Dep. 78:1-18.) Melby then spent several hours showing Beito how to load resident information into the program. (Melby Dep. 61:6-16; Beito Dep. 82:2-5.) The first step involved uploading the residents' demographic information. (Melby Dep. 61:6-16.) That process was extremely slow due to Westwood's problematic internet connection, and set back the beta testing by approximately a month. (*Id.* 61:17-22.)

A. **Issues with Resident Service Plans**

Upon a resident's admission to Westwood, Westwood's nurse creates a personalized service plan for that resident by compiling the nurse's own service assessment, any doctors' orders, and any requests from the resident to determine what services the resident will receive. (Beito Dep. 45:8-16, 111:21-112:9, 145:14-17; Melby Dep. 24:15-18, 25:9-18; M. Gorra Dep. 19:5-14.) Service plans are updated as residents'

needs change throughout the course of their stay.  (Beito Dep. 113:1-11; Melby Dep. 24:19-25:2.)  Although Westwood's nurse creates the assessment, Beito, as manager, was responsible for ensuring that each service plan is accurate.  (Beito Dep. 112:10-19, 156:23-157:1.)

During the beta testing, residents' doctors' orders were loaded into Lifestyle Ledger.  (Melby Dep. 62:8-13.)  When reviewing some of these files, Melby noticed that there were discrepancies between individual residents' doctors' orders and their service plans.  (*Id.* 62:13-63:1.)  For example, one resident's doctor ordered that the resident's blood pressure be checked once a week, but that test was not included on his service plan. (*Id.* 62:15-18.)  Melby brought these discrepancies to Beito's and Lehrke's attention.  (*Id.* 63:18-22.)  Melby then determined that Beito and Lehrke should assume responsibility of loading the doctors' orders into Lifestyle Ledger so they could double check them against the residents' service plans as they were loaded.  (*Id.* 67:8-17.)

## B.    Issues with Fee Structure

Sometime in late August or early September 2011, while Melby was loading information into Lifestyle Ledger she discovered that Westwood was not billing for additional services provided to residents, and was instead charging every resident a base fee. (Melby Dep. 72:7-23.)  She immediately brought this issue to Mike's attention, who then spoke with Beito.  (*Id.* 72:20-73:19; Beito Dep. 61:10-62:2.)

The service plans that are prepared for residents also document the method by which residents will pay Westwood.  (Beito Dep. 45:12-15; M. Gorra Dep. 19:8-14.) Some residents qualify for financial assistance from the county, state, and/or federal

government ("assisted pay") and others pay all costs associated with living at Westwood personally ("private pay").  (Melby Dep. 22:23-24:24.)   All assisted pay residents are assigned a case manager to review the service plan, file it with the state, and obtain approval for the necessary services and associated charges.  (*Id.* 23:19-24:15.)

Prior to 2006, all Westwood residents were billed a flat fee, known as the base fee, that included all available services offered by Westwood.  (M. Gorra Dep. 20:16-22; Beito Dep. 61:12-13, 63:17-21.)   In 2006, the State of Minnesota sent out notices indicating that it was moving to a customized billing program where assisted living facilities could bill each assisted pay resident the base rate plus fees for individual additional services provided to that resident.  (M. Gorra Dep. 20:16-22.)[5]

Between 2000 and 2008, Beito attended three in-person training programs presented by the Minnesota Department of Human Services and five video conferences regarding case management and fee-for-service billing practices for assisted pay residents.  (Beito Dep. 59:6-60:13.)  The parties disagree about the timeline surrounding the transition from flat fee billing to fee-for-service billing at Westwood.  Beito testified that she advised Mike several times about the ability to change the method of billing after 2006 from flat fee to a fee-for-service model.  (Beito Dep. 61:10-17.)  Beito testified that when she so advised Mike, he indicated that he did not want to change Westwood's billing procedures, and she therefore could not change the rates as such a change would

---

[5] Although these regulations did not explicitly affect private pay clients, they did have an important effect on billing for private pay clients, because the state will not pay a price for particular services provided to assisted pay clients if the price is higher than the amount charged to private pay clients.  (*See* M. Gorra Dep. 23:8-22; Melby Dep. 24:7-15.)

require his approval.  (*Id.*; R. Gorra Dep. 85:15-23.)  Mike testified that he became aware that Beito was still using a flat fee sometime between 2006 and 2010 and was unhappy that she had not been using a fee-for-service model earlier.  (M. Gorra Dep. 21:22-22:6.)

## C.    Beito's Frustrations with Lifestyle Ledger

At some point, Beito expressed her own frustration and that of other Westwood staff about Lifestyle Ledger to Melby.  (Beito Dep. 78:21-79:6.)[6]  Beito testified that she had "frustrations with the whole system" because there were problems with the software and "[t]he system would fail.  The equipment wasn't efficient.  There were service errors."  (*Id.* 79:21-80:2.)  Because of some of these concerns, the Westwood staff continued to maintain paper charting as backup to the data entered into Lifestyle Ledger. (Beito Dep. 82:17-25; Lehrke Aff. ¶ 18.)  Beito testified that when she expressed these concerns about Lifestyle Ledger to Melby, Melby

> would get upset with me and make statements to me, degrading statements. She told me that she would have to tell Mike that I was incompetent, and she questioned my ability learn. . . . She also said you used to be a good manager, but you're not anymore.  She told me that the younger staff caught on more quickly.

---

[6] Lehrke also had issues with Lifestyle Ledger.  Specifically, Lehrke states in her affidavit that "[w]hen the new computer system was implemented at Westwood, I found it unreliable and inefficient" and it would often crash.  (Lehrke Aff. ¶¶ 17, 22.)  Lehrke was also wary of the security on the system as she "was able to log-on simply by pressing 'enter' without using [her] password."  (*Id.* ¶ 21.)  Lehrke also indicated that she believed the settings of the program created the possibility that Westwood staff "would accidentally double-measure a medication for a resident."  (*Id.* ¶ 18.)  Because Lehrke believed the paper system was safer she "asked the personal care attendants to use the paper system in addition to the computer system through the time that [she] left."  (*Id.*)

(Beito Dep. 79:4-13.)  Melby spoke with Mike about what she perceived to be Beito's uncooperative attitude with respect to the beta testing.  (Melby Dep. 67:18-68:25.) Melby also reported to Mike the alleged errors described above that she found while loading information into the program.  (*Id.* 69:12-18.)

In response to Melby's reports, Mike faxed Beito a handwritten memo stating:

8-23-11

Westwood Place
Deanne Beito – Manager
<u>Directive</u>

1.) Assist Joyful, Inc. in loading software into Westwood Computers!
All other managerial duties are secondary until loading is complete
(by Aug. 31, 2011).

2.) <u>Secondary Directive</u>—develop cost list (with assistance of nurse) for
service to be offered, and now offered, by Westwood!
Effective immediately!!

M.J. Gorra
Owner

(Second Aff. of Amy Taber, Ex. K at 59, Dec. 23, 2013, Docket No. 35.)


### D.    Beito's Response to the Directives

In order to switch to fee-for-service billing, Westwood was required to negotiate with Carver County ("the County") and obtain approval of the reimbursement rate for each additional service not included in the base fee.  (Beito Dep. 60:16-61:7, 136:14-21.) Although Beito was the liaison between the County and Westwood, she testified that as owner, Mike needed to be involved in setting the price with the County for the additional services.  (*Id.* 61:5-17, 137:2-7.)

In response to the directive from Mike, Beito drafted a letter in September 2011 to all County case managers to obtain County approval for a proposed change in fee structure at Westwood.  (Beito Dep. 61:18-62:2, 86:10-87:15; Second Taber Aff., Ex. L at 60.)  The letter notified the case managers that Westwood would continue to offer a base package that included room and board in addition to a number of services and that "[a]dded fees will be applied for residents whose needs exceed our base service package." (Second Taber Aff., Ex. L at 60.)  The letter indicated that the new fee policy was effective as of September 15, 2011, but that all changes in payment would not be due until November 1, 2011.  (*Id.*)  Additionally, as directed by Mike, Beito developed a cost list for additional services not included in the base fee.  (Beito Dep. 84:18-85:24.)

Beito also drafted a letter to private pay residents reflecting the same change in fee structure, but Melby told her to delay notifying the private pay residents until negotiations with the County regarding fees for additional services were finalized.  (*Id.* 90:15-91:23; Melby Dep. 84:21-85:9; Second Taber Aff., Ex. M at 61.)  Private pay residents were eventually notified in March 2012 that the fee-for-service billing structure would take effect on April 1, 2012.  (Melby Dep. 84:21-85:15; Beito Dep. 60:16-22.)

Melby made two trips to the County in September or October to present it with the base rate and new fee-for-service billing information that had been communicated in the September 2011 letter.  (Melby Dep. 84:6-20.)  Additionally, Beito attempted to contact the County on several occasions, but when they finally responded, the County representative expressed confusion about the pricing assessments proposed by Westwood.  (Beito Dep. 62:4-63:1, 137:10-15.)  Melby then contacted the County in May

2012 to notify it that she was the new contact person at Westwood.  (Third Parra Decl., Ex. 8.)  The County ultimately began paying Westwood for assisted pay residents based on a fee-for-service basis in the late summer or early fall of 2012, after Beito's termination.  (Melby Dep. 143:2-7.)

### E.    Lifestyle Ledger Usage Improvements

Despite the difficulties with Lifestyle Ledger, in late spring or early summer of 2012 the staff at Westwood began using the system to enter orders into the computer. (Lehrke Aff. ¶ 22.)  On June 1, 2012, Melby wrote to staff members "Congratulations on a huge improvement in documenting Services and Medications/Treatments. . . . Keep up the great documenting in June."  (Third Parra Decl., Ex. 7 at 2.)  A July 2012 note stated "Westwood Staff, Thank you for recording the vitals on residents – it was 100% completed.  I also see July is off to a great start with many vitals already recorded.  The recording of medications and treatments for June was a huge improvement from May. . . . Overall great job – looking forward to even a better July."  (*Id.*)

## IV.   INJURY AND WORKERS' COMPENSATION CLAIM

On the afternoon of February 14, 2012, Beito went to meet with a nurse in Westwood's medication room.  (Beito Dep. 201:21-202:1.)  Beito was leaning on the edge of a desk when there was a knock on the door.  (*Id.* 202:2-4.)  Beito pushed off the desk chair in front of her as she went to answer the door and fell.  (*Id.* 202:6-12.)  Beito testified that there was a hole in the floor, but because the accident happened quickly, she was not entirely sure what happened – whether she tripped on the hole or if the desk chair

- 12 -

got stuck.  (*Id.* 202:7-12, 203:14-17.)  As she fell, Beito used her left hand to break her fall.  (*Id.* 202:14-16.)  After she noticed swelling in her wrist, Beito went to a clinic where a doctor determined that her wrist was broken, splinted the wrist, and referred Beito to an orthopedic doctor.  (*Id.* 205:20-25, 206:17-22.)

Beito returned to work that same day and reported the incident to Jack Ewig, a claims administrator for Westwood's workers' compensation insurer, West Bend Insurance ("West Bend").  (*Id.* 207:2-14; Third Parra Decl., Ex. 10 at 5.)  Beito then spoke with Mike about her wrist.  (Beito Dep. 206:22-25.)  When she spoke with Rick later that day Beito told him that "there was a hole in the floor," but she had not reported it to West Bend because she "didn't want to get anybody in trouble."  (*Id.* 213:19-25.)  Beito testified that she had previously informed the Gorras about the hole in the floor.  (*Id.* 203:20-204:3, 214:1-4.)

On February 15, 2012, Beito again spoke with Ewig about the accident.  (Third Parra Decl., Ex. 10 at 5; Second Taber Aff., Ex. O at 64.)[7]  Ewig spoke with Rick later in the day and noted that Rick "does not question this claim though he does not know why Deanne tripped and fell."  (Third Parra Decl., Ex. 10 at 5.)  On February 17, Ewig contacted Rick and told him of West Bend's plan to deny Beito's claim.  (*Id.*, Ex. 10 at 4.)  Rick asked "what about the hole in the floor?"  (*Id.*)  Rick explained that he had "sent

---

[7] Westwood produced a transcript of this conversation in connection with the present motion, and contends that Beito told Ewig that Beito attributed the trip and fall "to her 'own clumsiness.'"  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 13, Dec. 23, 2013, Docket No. 31.) But the responses of Beito to Ewig's questions in the transcript that Westwood cites have been redacted.  (Second Taber Aff., Ex. O at 69.)  Accordingly, the Court will not consider these purported responses in deciding Westwood's motion for summary judgment.

a workman over to put some sealant putty in" the hole.  (*Id.*)  Ewig told Rick that Beito had not mentioned a hole in her report of the injury and Rick "expressed dumbfoundedness that she didn't tell [Ewig] about it."  (*Id.*)

On February 20, Ewig received Beito's Workers' Compensation Questionnaire. (Second Taber Aff., Ex. Q at 1-2; Third Parra Decl., Ex. 10 at 4.)  In the questionnaire she again described the incident as a "trip & fall" and did not mention the hole in the floor.  (Second Taber Aff., Ex. Q at 1.)  After receiving the questionnaire, Ewig sent Beito a denial of liability.  (Third Parra Decl., Ex. 10 at 4.)

After receiving West Bend's denial of liability, Beito called Ewig.  (*Id.*)  During the conversation she mentioned the hole, explaining that she had forgotten to inform Ewig of the hole earlier and that the hole had been filled after her accident.  (*Id.*)  Ewig noted:

> At the end of the day, even if there was a hole in the floor, it was not until now that Deanne contends that it was a proximate cause of her fall.  This "story" was absent in her R/I, questionnaire, and again in today's initial telephone conversation.  She seems so bent on having the claim deemed compensable that she is willing to shamelessly fabricate.  The most I would possibly consider doing would be a mediation with a compromise resulting in a confirmed denial of primary liability, with a closeout of past and future medical care.

(*Id.*)  Notes from the clinic where Beito went following her injury indicated that when Beito presented at the clinic she stated that "she was getting off the desk, foot got caught and she fell forward trying to catch herself."  (*Id.*)  On March 12, Ewig's notes document what he interpreted as a "third story" that the wheel of the chair got stuck in the hole and Beito's foot caught on the chair causing her to fall.  (*Id.*)

- 14 -

On March 26, Ewig spoke with Rosenlund – the other nurse that was in the room at the time of Beito's accident.  (*Id.*, Ex. 10 at 3.)  Rosenlund indicated that Beito "immediately tripped over castered chair leg in front of her which was over a hole in the floor and fell to the floor."  (*Id.*)  The next day Beito called Ewig for an update on the status of her claim.  (*Id.*)  He indicated that West Bend was denying primary liability but recommended mediation, which Beito agreed to and scheduled for April 11, 2012.  (*Id.*; Beito Dep. 252:6-22.)

In early April 2012, Beito spoke with Mike about the denial of liability.  (Beito Dep. 261:16-262:7.)  Beito claims that she told Mike she would "appeal" the denial, upon advice of her son-in-law, and that in response Mike told her that she could be fired for threatening to "sue" her employer.  (*Id.* 262:2-7, 270:10-23.)  Mike testified that he believed threatening to sue regarding workers' compensation was a valid reason for termination because "[i]t just shows disrespect for the ownership."  (M. Gorra Dep. 133:11-23.)

Shortly thereafter, Rick told Beito she should not drag him into court over a workers' compensation claim.  (Beito Dep. 252:14-22.)  Beito became concerned that she was going to lose her job, so she cancelled the mediation and told Ewig "she just wants to drop the whole matter."  (*Id.* 253:21-25; Third Parra Decl., Ex. 10 at 3.)  Beito testified that she did not discuss the claim with the Gorras again.  (Beito Dep. 267:11-17.)  However, Rick testified that he recalled Mike bringing the issue up several times and stating something to the effect of "God, look it, Deanne's filing false insurance claims on us."  (R. Gorra Dep. 142:3-11.)  Melby also told Mike that "with the workman's comp

claim, falsely submitting that, I said if [Beito] were my employee, I would fire somebody for falsely submitting a workmen's comp claim." (Melby Dep. 174:17-175:8.)

## V.   ACCOUNTS AND SAFETY ISSUES

During Beito's tenure as manager, there were two instances in which resident accounts were substantially in arrears. (Beito Dep. 115:9.) Beito testified that with respect to one account that was at one point $22,000 (or approximately 10 months) in arrears, she was in constant contact with the resident's family and there was an estate issue that required resolution before Westwood could be fully paid. (*Id.* 115:11-20.) The account had been in arrears at least once before, and the family and Mike had worked out payment and brought the account up to date. (*Id.* 116:19-22.) Because of this prior arrearage which had been paid, Beito testified that she was not concerned with the account. (*Id.* 118:7-19.) When the debt became "overly in arrears," she alerted Mike about the account in early 2012. (*Id.* 115:2-17; M. Gorra Dep. 15:18-16:4.)

A second resident account was in arrears of $10,000 before Beito told Rick about it. (Beito Dep. 117:2-11.) The resident was a private pay client, and her family informed Beito they were in the 30- to 90-day waiting period of applying for medical assistance. (*Id.* 117:7-10.) The account was ultimately referred to collections. (*Id.* 117:14-15.)

In February 2012 Melby discovered issues with service plans that Beito had authorized which were still using Westwood's base fee and therefore failing to charge residents for additional services pursuant to the fee-for-service model. (Melby Dep. 85:22-86:19.) Beito, Lehrke, Mike, and Melby met to discuss the issue. (Beito Dep.

110:25-111:10.)  Apparently due to these issues, on March 1, 2012, Mike faxed Beito the

following written directive:

MANAGER - DEANNE

1. Use current grid system (point assessment) immediately for all
   residents.

   a.  Monthly rate for residents is determined off the assessment of the
       "individual" resident.  (Base rate plus assessment creating an
       individualized fee)

   b.  Assessment is done with the service plan.  Always give a copy of
       the service plan to the family.  The family signs our copy.

   c.  Use computer service plan found on computer and attach any
       needed addendums.

   d.  Discontinue paper records immediately (today).  Everything that
       can be put on the computer shall be put on the computer.

   e.  Manager must be familiar with the point system and pricing for
       every resident and check for accuracy.  The manager is
       responsible for the accuracy of the service plans and must have
       an understanding of the computer program.

   f.  If any problems with understanding the pricing or any other
       procedure the manager will consult with the owner without
       delay.

   *Note:*
   *Resident point assessments are completed yearly or if and when*
   *resident's condition changes.  Changes in services and/or points*
   *will require update service plans.*

(Second Taber Aff., Ex. X at 30; Beito Dep. 163:15-24.)  Beito met with Lehrke the day

she received the directive, signed the directive and faxed it back to Mike, after writing

"completed" next to items a, b, d, and e.  (Second Taber Aff., Ex. X at 30; Beito Dep.

164:22-165:10.)  Beito testified that everything on the list was already being done prior to

the directive, except for the individualized rates for county residents and the exclusive

use of computer records.  (Beito Dep. 166:2-167:25.)  Westwood stopped using paper records completely after this directive.  (*Id.* 166:22-23.)

Melby testified that another billing issue occurred in May 2012 when Beito billed a resident for the base fee only, without including an assessment of charges for additional fees.  (Melby Dep. 108:18-24; Second Taber Aff., Ex. Y at 31.)  In notes of her meeting with Beito about the billing issue, Melby indicated that after she explained the assessment procedure Beito indicated she now understood it.  (Second Taber Aff., Ex. Y at 31.)  The next day Melby again met with Beito who informed her that she only billed the base fee for the assisted pay residents, because that was the most the County would pay.  (*Id.*, Ex. Z at 32.)  Shortly thereafter, Mike determined that Beito would no longer be Westwood's liaison to the County, and designated Melby as the contact person.  (M. Gorra Dep. 154:7-15; Melby Dep. 105:11-24; Second Taber Aff., Ex. AA at 33.)

Later in the spring of 2012 two incidents occurred regarding resident safety that are related to Beito's termination.  First, on May 16, 2012, a resident wandered out of the building and fell in the parking lot.  (Second Taber Aff., Ex. BB at 35.)  Westwood contends that this was Beito's fault for failure to use Wanderguard.  (Third Parra Decl., Ex. 14 at 2.)  Wanderguard is a system used to prevent elderly adults with histories of wandering from leaving a building.  (Lehrke Aff. ¶ 23.)  Staff would put a band on the wrist of residents with memory problems and an alarm would go off when the resident approached any door to the outside.  (*Id.* ¶ 23.)  The system was supposed to include a tester for the doors and for the armband, but the door tester at Westwood was missing or had never arrived at the facility, meaning that even if a resident was wearing a

Wanderguard band, no alarm would sound when they approached the facility's doors. (*Id.* ¶¶ 23-25.)

On July 11, 2012, a Westwood employee allowed a resident to walk unassisted with her walker and the resident fell and broke her arm. (Second Taber Aff., Ex. CC at 36; *id.*, Ex. DD at 37; Beito Dep. 127:15-22.) Pursuant to doctor's orders, the resident was supposed to have "staff assistance whenever she moves around her room." (Beito Dep. 126:17-24.) Beito testified that she believed the orders had been followed because the Westwood employee was walking behind the resident's walker when the accident occurred, which constituted assistance. (*Id.* 129:5-24.)

## VI.   BEITO'S TERMINATION

When Beito returned to work from vacation on July 23, 2012, the Gorras entered Beito's office, locked the door, sat down with Beito, and terminated her. (*Id.* 130:15-21.) When Beito asked why, the Gorras stated that they would rather not get into the reasons, but Beito insisted that she had a right to know. (*Id.* 130:22-24.) The Gorras then stated that the termination was because of billing issues, resident care issues, her failure to support and assist in the rollout of the new computer program, and her failure to allow staff to talk to the owners. (*Id.* 131:2-7.) In its answers to interrogatories, Westwood contends that at her termination meeting, the Gorras also told Beito she was being terminated due to the occupancy/vacancy rate as well as failure to follow dietary directives for residents. (Third Parra Decl., Ex. 12 at 17.) Beito stated that these assessments of her performance were not true and that she believed she was discharged because of her age (seventy years old). (Beito Dep. 131:9-19.)

A.      **Unemployment Benefits**

After her termination, Beito applied for and received unemployment benefits. (Third Parra Decl., Ex. 13.)  Mike's response to the unemployment commission provided a list of nineteen reasons for Beito's discharge.  (*Id.*, Ex. 14.)  Mike testified that none of the nineteen reasons "were specifically designed to say that we fired her because of the reason.  This just showed her - - the trend that she was following."  (M. Gorra Dep. 133:25-134:3.)  The nineteen reasons given were:

1. Did not allow employees to talk to the applicants superiors (owners).  Our staff are seen by the state as "mandated reporters" for vulnerable adults and should be allowed to report any maltreatment or concerns.

2. Failed to correct employee negligence problems after several warnings from other employees that resulted in a resident injury.

3. Didn't let employees talk to residents.

4. Didn't use or make available Wanderguard for qualifying residents as ordered since 2002.

5. Failed to acknowledge client and their family requests regarding services pertinent to their care.

6. Restricted staff from implementing a diabetic diet and did not provide the dietary staff with a list of clients with diabetes after Westwood Place hired Nutritional, Weight and Wellness who presented three inservices totaling six hours to our staff.

7. Failed to correctly complete service contracts after being trained and several demands by owner.

8. Failed to bill for services rendered after being trained and ordered by owner.

9. Changed standard procedures (dropped damage deposits) without consulting or notifying owners (2006).

10. Changed her work hours without consulting or notifying owners.

11. Delegated her duties to others without consulting or notifying owners.

12. Didn't answer business phone for hours at a time (last two years).

13. Didn't change over to call waiting when necessary (last two years).

- 20 -

14. Fired an employee two weeks before Christmas when the employee had given a two month notice.

15. Told owners the business phone didn't have call waiting when it did (July 2012).

16. Did not collect or notify owner on over $30,000 of back rent (period from 2011-2012).

17. Reluctant to assist in the roll out of a software program implemented in July of 2011, and did not take a leadership role in using it.

18. Tried to file a false insurance claim, when she broke her wrist.

19. Threatened erroneous lawsuit against owners in April 2012.

(Third Parra Decl., Ex. 14)

In addition to disputes about billing, resident safety, the implementation of Lifestyle Ledger, and Beito's workers' compensation claim outlined above, which are related to Reasons 2, 4, 7, 8, 16, 17, 18, 19, Beito also contests the validity of a variety of the other reasons for her termination. With respect to Reason 1, Westwood employees are allowed to talk with the Gorras about anything related to Westwood while the Gorras are at the facility, and their phone numbers are also on the wall for use in case of emergency. (R. Gorra Dep. 31:22-33:7.) Rick testified that calling the Gorras was for emergencies only and that employees were to go to Beito first with any issues. (*Id.* 32:8-10, 32:24-33:1, 39:11-18.) Rick testified that no employees ever told him that they were afraid to report maltreatment. (*Id.* 108:18-23.) Mike also testified that he was not "aware of any employee who didn't report a concern of maltreatment to [him] because of an instruction Deanne gave them." (M. Gorra Dep. 130:7-10.)

As to Reason 6, Beito testified that she had never been requested to provide a list of diabetic clients to dietary staff. (Beito Dep. 99:6-18.) With respect to Reason 9, Rick testified that he learned of the change in damage deposit procedure in 2011 and that he

was unaware whether the change had cost Westwood money.  (R. Gorra Dep. 116:4-117:25.)

In response to Reason 10, Beito testified that she typically worked from 8:00 a.m. to 5:00 or 5:30 p.m., Monday through Friday.  (Beito Dep. 93:9-13.)  There is no evidence in the record that different hours were expected.  Mike testified that Beito originally worked from 8:00 a.m. to 4:30 p.m. but that she changed her hours to 9:00 a.m. to 4:00 p.m.  (M. Gorra Dep. 119:21-25.)  Mike also testified that Beito made this hour change in the early 1990s and that the change in hours "wasn't a reason for termination." (*Id.* 119:23-120:7.)  Specifically, Mike testified "[t]hat by itself wouldn't have got her terminated, but that along with these other 18 did."  (*Id.* 120:13-15.)

As to Reason 12, Lehrke testified that "whenever [Beito] could, she answered the telephone as part of her job."  (Lehrke Aff. ¶ 12.)  Lehrke also testified that circumstances at Westwood did not allow Beito to answer every phone call, such as the fact that Westwood's portable phone did not consistently work in all sections of the building.  (*Id.*)  Lehrke also indicated that Beito instructed other Westwood employees to answer the phone when she was unavailable.  (*Id.* ¶ 13.)

With respect to Reason 14 and her responsibilities for terminating employees, Beito testified that she terminated five to six employees, three of whom she remembered specifically.  (Beito Dep. 34:17-24.)  Two of the employees were terminated after they were caught stealing drugs from Westwood.  (*Id.* 35:4-7, 36:4-5.)  The third employee was terminated for disrespectful conduct.  (*Id.* 35:7-36:1.)  Finally, as for the low occupancy rates given as a reason for termination in Westwood's answer to Beito's

interrogatories, the number of vacancies has actually substantially increased since Beito's termination. (Third Parra Decl., Ex. 3 at 4-12.)

### B. Subsequent Managers

After Beito's termination, Melby became the interim manager of Westwood. (M. Gorra Dep. 107:6-108:12.) Melby was also involved in the hiring process for the new manager, and she interviewed her replacement, Theresa Sullivan, with Mike. (*Id.* 109:10-14.) Theresa Sullivan managed Westwood from August 2012 until she resigned in May of 2013, due to what she described as a hostile work environment. (*Id.* 110:22-111:23.) After Sullivan resigned, Melby again took over as interim manager of Westwood. (*Id.* 113:4-20.) Melby and Mike then hired Tammie Graupmann. (*Id.*) Both Sullivan and Graupmann were in their forties when they were hired by Westwood. (Third Parra Decl., Exs. 15-16.)

## VII. WORK INSTANCES INVOLVING BEITO'S AGE

Beito alleges that there were several incidents during her employment where her age was put at issue by the Gorras. In his deposition Mike testified that Beito could have remained at Westwood until she was 110 if she had been doing her job, "because she looked good" and "a lot younger" than her age. (M. Gorra Dep. 88:12-16, 89:3-4.) Mike also stated that for Beito's position he preferred someone Beito's age who looked as young as Beito. (*Id.* 88:24-89:4.)

In September 2011, Mike overheard a phone call between Beito and Beito's daughter during which Beito told her daughter she was not ready to retire. (Beito Dep.

106:5-109:2.)  Rick later told Beito that Mike had overheard the conversation, and Rick asked Beito not to quit.  (*Id.* 108:1-6.)  He told her she was a good manager, and she told him the Gorras would be the first to know if she had plans to retire.  (*Id.*)  Beito also claims that Rick and Rick's wife told her to simply keep doing her job, and that it would be "stupid" for Mike to fire Beito because Beito could then file an age discrimination lawsuit.  (Third Parra Decl., Ex. 9 at 4.)  Beito testified that Rick continued to ask her about retirement throughout late 2011 and early 2012.  (Beito Dep. 108:1-24.)

Westwood presented evidence that of the thirty-one employees working at Westwood during the five years preceding Beito's termination, twenty-three were over the age of forty.  (Second Taber Aff., Ex. C at 40-41.)  None of these employees were terminated.  (*Id.*)

## VIII.  CHARGE OF DISCRIMINATION

In November 2012 Beito filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Third Parra Decl., Ex. 17.)  In its response, Westwood listed the reasons for Beito's termination as resident endangerment issues, interference with staff reporting mandates, refusal to bill for allowed add-on charges and delinquent residential accounts, resistance to other changes, and "worker's compensation claim."  (Third Parra Decl., Ex. 18 at 7.)  The response also discussed Beito's refusal to market or promote Westwood and refusal to implement use of an electronic time clock.  (*Id.*, Ex. 18 at 9-10.)  With respect to the workers' compensation claim, the response indicated:

- 24 -

> The worker's compensation claim and its denial as explained to Michael J. Gorra by the claims adjuster for the workers' compensation carrier and the Charging Party's threat of a lawsuit against Westwood, raise additional concerns over the Charging Party's credibility and her desire to remain an employee of the Company.

(*Id.*, Ex. 18 at 11.)  Mike testified that he never spoke to any representative from West Bend (the claims adjuster) and did not review any of the documents associated with Beito's workers' compensation claim before firing her.  (M. Gorra Dep. 15:9-12.)

## IX.   COMPLAINT

On March 8, 2013, Beito filed a complaint against Westwood alleging that she was terminated due to her age in violation of the ADEA and the MHRA.  (Compl. ¶¶ 26-37, Mar. 8, 2013, Docket No. 1.)  Beito filed an amended complaint on September 26, 2013, alleging an additional claim for violation of Minn. Stat. § 176.82, subd. 1, which makes it unlawful for any person to discharge or threaten to discharge an employee for seeking workers' compensation benefits.  (Am. Compl. ¶¶ 44-49, Sept. 26, 2013, Docket No. 26.)

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal quotation marks omitted).

## II.    WORKERS' COMPENSATION CLAIMS

Although the amended complaint is not a model of clarity, it appears that Beito alleges two separate claims under Minnesota's Workers' Compensation Act.  First, Beito argues that Westwood threatened to discharge her for seeking benefits under the Act, and second, that Westwood terminated her in retaliation for seeking workers' compensation benefits.  (*See* Am. Compl. ¶¶ 21, 25, 45.)

### A.    Threat to Discharge

Minnesota Statutes § 176.82, subdivision 1. creates liability for "threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits."  Minn.

Stat § 176.82, subd. 1.  A claim for threatening to discharge an employee for seeking

workers' compensation benefits requires a plaintiff to show that:

> (1) a person with knowledge that the plaintiff suffered a workplace injury;
> (2) attempted to dissuade the plaintiff from seeking workers' compensation
> benefits through one or more communications; (3) the communication(s)
> created a reasonable apprehension of discharge; and (4) as a result, the
> plaintiff delayed or ceased seeking workers' compensation benefits.

*Schmitz v. U.S. Steel Corp.*, 831 N.W.2d 656, 669 (Minn. Ct. App. 2013).  A plaintiff is

not required to show "that the threat resulted in an actual loss of benefits" as such a

requirement "would transform a claim for 'threatening to discharge' an employee into

another form of an intentional-obstruction-of-benefits claims, rendering the language of

the statute superfluous." *Id.*

Westwood argues that Beito's claim for threat to discharge cannot survive

summary judgment because "neither Mike nor Rick said or did anything, or engaged in

any conduct that led her to believe that she could not or should not seek workers'

compensation benefits during her employment."  (Def.'s Mem. in Supp. of Mot. for

Summ. J. at 29, Dec. 23, 2013, Docket No. 31.)  But Westwood's argument focuses

entirely on the period of time when Beito **initially** sought workers' compensation benefits

on February 14 – the day of the accident.  In defining what constitutes a threat "for

seeking" workers' compensation benefits, the Minnesota Court of Appeals has concluded

that to seek means "[t]o endeavor to obtain," and therefore the statute "'provide[s] a

cause of action for an employee when an employer or insurance carrier used threats or

coercion to discourage or prevent an employee **from pursuing a claim** for workers'

compensation.'"  *Schmitz*, 831 N.W.2d at 667 (emphasis added) (quoting *Furrer v.*

*Campbell's Soup Co.*, 403 N.W.2d 658, 660 (Minn. Ct. App. 1987)).   Therefore, an employee has a cause of action under the statute if an employer's conduct prevents an employee from taking steps in furtherance of obtaining workers' compensation benefits, even if the conduct occurs after the initial claim for benefits has already been made.

With this interpretation in mind, the Court concludes that Beito has presented sufficient evidence in support of her threat to discharge claim to survive summary judgment.   With respect to the first element, it is undisputed that the Gorras had knowledge that Beito suffered an injury at work.   Beito testified that she spoke with both Mike and Rick on the day of her injury, and that Rick was in contact with West Bend regarding the injury.

As for the second and third element – that the person with knowledge attempted to dissuade the employee from seeking workers' compensation benefits and that the attempt created a reasonable apprehension of discharge – the Court concludes that Beito has presented sufficient evidence upon which a reasonable jury could conclude that the Gorras attempted to dissuade her from seeking workers' compensation benefits and this attempt created a reasonable apprehension of discharge.   Specifically, Beito communicated to Mike that West Bend had denied her workers' compensation benefits and that she intended to appeal that denial.[8]   At that point Mike told her she could be

---

[8] Westwood argues that Beito's deposition testimony regarding her conversation with Mike is "inconsistent" with the allegations in the amended complaint.  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 16 n.12, 30.)   In the amended complaint, Beito alleges that "Plaintiff told Michael Gorra that she believed she had been illegally denied workers' compensation benefits and that her son-in-law had offered to help her file a lawsuit against Westwood because of it." (Am. Compl. ¶ 21.)   In her deposition Beito testified that she told Mike that her son-in-law "said

(Footnote continued on next page.)

fired for threatening to sue her employer.   Shortly thereafter, Rick told Beito that she should not drag him into court over a workers' compensation claim.   Beito testified that as a result of these comments she became concerned about losing her job.   A reasonable jury could conclude that the Gorras' comments – suggesting that it would be possible that she would be fired – were intended to dissuade Beito from further pursuing her workers' compensation benefits.

Westwood argues that Mike's response – that Beito could be fired for threatening to sue her employer "shows that it was Plaintiff's **comment** that prompted his response – not her pursuit of benefits" and that the response "provoked by Plaintiff's comment is substantially different from Mike making an unsolicited comment to Plaintiff in an attempt to dissuade her from seeking workers' compensation benefits." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 31 (emphasis in original).)   Therefore, Westwood contends that summary judgment in its favor is appropriate regarding Beito's threat to discharge

_____

(Footnote continued.)

that I could appeal the denial claim." (Beito Dep. 262:2-4.)  In response to the question "So it's your testimony as we sit here today that . . . you did not tell Mike Gorra that your son-in-law had offered to help you file a lawsuit against Westwood," Beito answered "I don't know how to answer that, because is the lawsuit and an appeal the same thing?" (*Id.* 262:18-23.)   Even assuming that the recitation of the conversation in the amended complaint and the deposition are inconsistent (which, given Beito's testimony indicating that she believed an appeal and a lawsuit to be the same thing is unlikely), Westwood fails to explain what impact such an inconsistency has on the present motion.   In other words, Westwood has identified no material difference between use of the term "appeal" or "lawsuit" in the context of a threat to discharge claim. Whether Beito used the word "appeal" or "lawsuit" when she spoke to Mike about her intent to challenge the denial of her workers' compensation benefits, it is undisputed that Mike responded by telling her that she could be fired for threatening to sue him.   A reasonable jury could conclude that this statement – whether made in response to a comment that Beito would appeal the denial or file a lawsuit regarding the denial – dissuaded Beito from pursuing her workers' compensation benefits.

claim.  But Westwood's argument fails for three primary reasons.  First, even assuming that Beito's comment could be disaggregated from her pursuit of benefits and that Mike's response was directed solely at the fact of her comment not its content, Westwood fails to explain the significance of this distinction.  In other words, whether Mike told Beito that she could be fired for threatening to sue her employer in response to the fact that Beito made a comment or because she threatened to sue over the denial of her workers' compensation benefits, a reasonable jury could still conclude that Mike's communication was made to dissuade Beito from pursuing workers' compensation benefits and created in Beito a reasonable apprehension of discharge.  Second, Westwood has identified no authority for the proposition that Minn. Stat § 176.82, subd. 1, requires that an employer's threat to discharge come in the form of an unsolicited comment, rather than in response to a conversation initiated by the employee.  Finally, Westwood's interpretation of Mike's comments – and what he meant or did not mean – weighs the evidence and draws inferences about Mike's comment, which are functions of the jury – not questions to be resolved by the Court on summary judgment.  Therefore, the Court concludes that Beito has satisfied her burden of proof at this stage that Westwood attempted to dissuade her from seeking workers' compensation benefits which had the effect of creating a reasonable apprehension of discharge.

Finally, it is undisputed that Beito has satisfied the fourth element of her threat to discharge claim – that she delayed or ceased seeking workers' compensation benefits.  This element requires that the employee "not only feel threatened but also be deterred in some way, either by not filing a claim, delaying filing a claim, or taking some other

action to the detriment of recovering benefits." *Schmitz*, 831 N.W.2d at 668; *see also*

*Summers v. R&D Agency, Inc.*, 593 N.W.2d 241, 244 (Minn. Ct. App. 1999) (explaining

that a cause of action under Minn. Stat. § 176.82 "requires an actual obstruction of

benefits"). In response to the denial of her workers' compensation claim, Beito agreed to

mediation, which could have provided her with certain benefits under the statute. *See*

*Fjeld v. Olsen*, No. C4-00-2077, 2001 WL 826880, at *1 (Minn. Ct. App. July 24, 2001)

(noting that a settlement reached in a voluntary mediation resulted in an agreement by the

workers' compensation in insurer to pay the employee). Although up until the point that

she spoke with the Gorras regarding her claim Beito had been diligently pursuing her

workers' compensation claim, shortly after she spoke with Mike and he told her she

could be fired for appealing or filing a lawsuit related to the denial of her workers'

compensation benefits, she cancelled the mediation and told West Bend that she "just

want[ed] to drop the whole matter." (Beito Dep. 253:21-25.) Failing to go forward with

mediation certainly was an "action to the detriment" of Beito recovering benefits under

the Act. *See Schmitz*, 831 N.W.2d at 668. Furthermore, because Beito "drop[ped] the

whole matter," in addition to not participating in mediation, she also never exercised her

other rights under the Workers' Compensation Act, such as initiating proceedings to

challenge West Bend's denial of coverage, that could have entitled her to benefits under

the Act. *See, e.g.*, Minn. Stat. §§ 176.271, 176.291. Because a reasonable jury could

conclude that the Gorras attempted to dissuade Beito from pursuing her workers'

compensation claim by creating a reasonable apprehension of discharge, and that Beito

stopped pursuing her workers' compensation benefits as a result, the Court will deny

Westwood's motion for summary judgment with respect to Beito's threat of discharge claim.

### B.    Retaliatory Discharge

Minnesota Statutes § 176.82 provides that "[a]ny person discharging . . . an employee for seeking workers' compensation benefits . . . is liable in a civil action for damages incurred by the employee." Minn. Stat. § 176.82, subd. 1. "To defeat summary judgment on a retaliation claim, a plaintiff must produce either direct evidence of retaliation, or create an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011) (internal quotation marks omitted); *see also Yalley v. Ozark Auto. Distribs., Inc.*, Civ. No. 11-1961, 2013 WL 50452, at *7 & n.11 (D. Minn. Jan. 3, 2013) (allowing plaintiff to prove his retaliation claim under Minnesota's Workers' Compensation Act through direct evidence). Beito claims that she can establish direct evidence that her termination was in retaliation for seeking workers' compensation benefits, making the *McDonnell Douglas* framework unnecessary.[9]

"Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for

---

[9] Even where a plaintiff shows retaliation with direct evidence, she must still show that she engaged in protected conduct. *See Smith v. Int'l Paper Co.*, 523 F.3d 845, 848 n.2 (8th Cir. 2008). Here, it is undisputed that Beito engaged in protected conduct when she filed a workers' compensation claim. *See Otto v. City of Victoria*, 834 F. Supp. 2d 912, 919 (D. Minn. 2011) (explaining that the employee engaged in protected conduct when he "applied for workers' compensation benefits").

the protected conduct." *Pye*, 641 F.3d at 1020. "'Direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *see also Friend v. Gopher Co.*, 771 N.W.2d 33, 38 (Minn. Ct. App. 2009) ("In contrast to the process of elimination that takes place under *McDonnell Douglas*, direct-evidence cases are adjudicated based on the strength of affirmative evidence of discriminatory motive."). Direct "evidence must be strong and must clearly point to the presence of an illegal motive for the adverse action," *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012) (alteration and internal quotation marks omitted), and is most often comprised of "remarks by decisionmakers that reflect, without inference, a [retaliatory] bias," *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 861 (8th Cir. 2009).

Beito argues that there is direct evidence that she was terminated because of her workers' compensation claim because (1) the Gorras threatened her with discharge for pursuing workers' compensation claims; and (2) the various documents memorializing the reasons for Beito's termination include the reason that she filed a workers' compensation claim. The Court concludes that this evidence provides the specific link between the adverse action and the protected conduct required to employ the direct evidence method. Here, Mike stated in his reasons for Beito's termination that she was terminated because she "[t]ried to file a false insurance claim, when she broke her wrist" and "[t]hreatened erroneous lawsuit against owners in April 2012." (Third Parra Decl., Ex. 14 at 3.) Melby also testified that one of the reasons Mike fired Beito was "the workman's comp claim that she tried to fraudulently submit." (Melby Dep. 170:1-21.)

Additionally in Westwood's response to Beito's filing with the EEOC it listed "the following performance deficiencies . . . discovered under her watch as director" which included "[w]orker's compensation claim." (Third Parra Decl., Ex. 18 at 6-7.)[10]  This type of evidence "directly reflects the alleged [retaliatory] attitude" of the decisionmaker, and is not "of the sort that would require a series of inferences to be drawn before a discriminatory attitude could be attributed to those who made the employment decisions she challenges." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 926 (8th Cir. 2001) (internal quotation marks omitted); *see Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (finding direct evidence of a causal link between the protected activity of filing a formal complaint of harassment and plaintiff's termination where the supervisor "wadded up her complaint, called it 'total bullshit,' threw it in the garbage can, told her to leave, and said that he never wanted to see her again"); *Yalley*, 2013 WL 50452 at *7 (finding direct evidence of retaliation for filing workers' compensation claim where employer stated "Yalley was being terminated because he had been costing the company too much money").  "An employer may not subjectively assess the validity of an employee's workers' compensation claim and use self-help as punishment without exposure to a retaliatory discharge suit." *Randall v. N. Milk*

---

[10] The evidence presented here distinguishes Beito's case from non-direct evidence in other, somewhat similar cases where the employer's stated reason for termination is related to the workers' compensation claim but is framed as a breach of company policy. *See Schaefer v. BioLife Plasma L.L.C.*, Civ. No. 11-3468, 2013 WL 5275818, at *5 n.8 (D. Minn. Sept. 18, 2013) ("Schaefer claims that she presents direct evidence of retaliation because BioLife's termination of Schaefer was related to her claim that she was injured.  But Schaefer does not present any direct evidence that she was terminated because of her workers' compensation claim.  Rather, the evidence she identifies (for example the Employee Conference Memorandum) states that she was terminated because she falsified a company report, that is, the incident report.").

*Products, Inc.*, 519 N.W.2d 456, 460 (Minn. Ct. App. 1994). Similarly, it would be contrary to the "remedial and humanitarian purpose of the Worker's Compensation Act," *Harrison v. Schafer Constr. Co.*, 257 N.W.2d 336, 338 (Minn. 1977), to allow employers to fire an employee for the stated reason that the employee filed a workers' compensation claim that was denied, as such a practice could have as much of a chilling effect on seeking benefits as would firing employees that successfully obtain benefits under the Act. Accordingly, based on the record presented here, the Court concludes that the evidence is sufficient for a reasonable jury to find a direct causal link between Beito's termination and her application for workers' compensation benefits, and will therefore deny Westwood's motion for summary judgment with respect to this claim.

## III.   AGE DISCRIMINATION

The ADEA makes it unlawful for an employer to discriminate against any individual based on age, 29 U.S.C. § 623(a)(1), and prohibits discrimination against individuals who are at least forty years old, *id.* § 631(a). Similarly, the MHRA prohibits an employer from making adverse employment decisions against an employee on the basis of the employee's age. Minn. Stat. § 363A.08, subd. 2. The plaintiff must establish that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).[11] In the absence of direct evidence, courts apply

---

[11] Beito argues that under the MHRA the plaintiff is required to demonstrate only that "age was '**a** motivating factor' in the termination decision, rather than the determinative factor." (Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 25, Jan. 13, 2014, Docket No. 37 (emphasis in original) (quoting *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123 (8th Cir. 2008)). In 2009 the Supreme Court decided *Gross*, holding that a but-for causation standard applies to

(Footnote continued on next page.)

the *McDonnell Douglas* burden-shifting framework to claims for age discrimination. *See Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 468 (8th Cir. 2011); *Friend*, 771 N.W.2d at 37-38. In a wrongful termination case, a plaintiff must first demonstrate a prima facie case of age discrimination by showing that (1) she was over 40 years old; (2) she was terminated; (3) she was meeting her employer's reasonable expectations at the time she was terminated; and (4) she was replaced by an individual who was substantially younger." *Haigh*, 632 F.3d at 468. "Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Rahlf*, 642 F.3d at 637. Once the employer comes forward with a legitimate, nondiscriminatory reason, "the burden returns to [the plaintiff] to prove [the employer]'s reason was mere pretext for discrimination." *Haigh*, 632 F.3d at 468. Here, Westwood concedes that for purposes of this motion, Beito has established a prima facie case of age discrimination. Accordingly, the Court will analyze only Westwood's proffered reason for termination and Beito's evidence of pretext.

_____

(Footnote continued.)

ADEA claims. 557 U.S. at 177. Although Minnesota courts have typically construed MHRA claims "in accordance with federal precedent," *Rothmeir v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1338 (8th Cir. 1996), Minnesota courts have not yet addressed the causation standard under the MHRA in light of *Gross*, *see Wagner v. Gallup, Inc.*, Civ. No. 12-1816, 2013 WL 6729429, at *3 n.4 (D. Minn. Dec. 20, 2013). Post-*Gross*, the Eighth Circuit and courts in this District have continued to apply analogous standards to claims brought under the ADEA and MHRA. *See, e.g.*, *Chambers v. Travelers Cos.*, 668 F.3d 559, 566 (8th Cir. 2012); *Rahlf v. Mo-Tech Corp.*, 642 F.3d 633, 636 n.2 (8th Cir. 2011); *McCraken v. Carleton College*, 969 F. Supp. 2d 1118, 1127 (D. Minn. 2013). Because the Court concludes that summary judgment in Westwood's favor is inappropriate on Beito's age discrimination claim, even under the more difficult but for standard of causation established in *Gross*, it need not address at this time whether it would be sufficient for Beito to show, for purposes of her MHRA claim, that age was simply a motivating rather than a determinative factor in her termination. Instead the Court will analyze the claims under the MHRA and the ADEA using the same standards.

### A.      Legitimate Nondiscriminatory Reason

At this stage, Westwood must merely "articulate[] lawful reasons for the action; that is, . . . produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256-57 (1981) (holding that "the employer's burden is satisfied if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons" (alterations and internal quotation marks omitted)).  Here, the Court concludes that Westwood has offered some legitimate, nondiscriminatory reasons for termination.   Specifically, as described in Westwood's brief, Beito was terminated for performing issues that include, but are not limited to "(1) repeatedly failing to maintain correct, up-to-date resident service plans; (2) failing to take necessary action so Westwood could bill for customized living services; (3) failing to support the implementation of a new software program; (4) allowing two resident accounts to become considerably overdue; and (5) two concerning resident care incidents."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 1.) These proffered reasons are sufficient to satisfy Westwood's burden at this stage.  *See Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1108 (8th Cir. 1998) (holding that "poor job performance" was a legitimate, nondiscriminatory reason for termination).

### B.      Pretext

At this stage, Beito "must present evidence, that considered in its entirety (1) creates a fact issue as to whether the defendant's proffered reasons are pretextual and

(2) creates a reasonable inference that age was a determinative factor in the adverse employment decision." *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011) (internal quotation marks omitted).  A pretext inquiry "is limited to whether the employer gave an honest explanation of its behavior, not whether its action was wise, fair, or correct." *McKay v. U.S. Dep't of Transp.*, 340 F.3d 695, 700 (8th Cir. 2003) (internal quotation marks omitted).  Pretext may be shown by demonstrating that an employer's explanation for an adverse employment action "is unworthy of credence because it has no basis in fact." *Torgerson*, 643 F.3d at 1047 (alteration and internal quotation marks omitted).  A plaintiff may also demonstrate a material question of fact regarding pretext "by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp. Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

With respect to the second part of the pretext inquiry, evidence that an employer's termination decision was based on age may include "either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees.)" *Rahlf*, 642 F.3d at 637 (internal quotation marks omitted).  Here, the Court concludes that Beito has presented sufficient evidence of pretext to survive Westwood's motion for summary judgment by presenting evidence of Westwood's shifting explanation, evidence refuting the factual basis for the stated termination reasons, and circumstantial evidence that her age was a determinative factor in her termination.

## 1.      Shifting Explanation

First, Beito has identified that Westwood's explanation for her termination has shifted over time.  During her termination meeting, the Gorras stated that Beito was being terminated because of billing issues, resident care issues, problems with Beito's support and assistance related to LifeStyle Ledger, and her failure to allow staff to talk to the Gorras.  In response to the unemployment commission, Mike raised an entirely new set of issues, for example, the fact that Beito changed her work hours in the late 1990s, changed the procedure for damage deposits in 2006, fired an employee two weeks before Christmas, and filed a workers' compensation claim.  In response to Beito's EEOC charge, Westwood listed its reasons for termination as resident endangerment issues, interference with staff reporting mandates, refusal to bill for allowed add-on charges and delinquent residential accounts, resistance to other changes, and her filing of a workers' compensation claim, and added Beito's alleged refusal to market or promote Westwood and use an electronic time clock as a basis for termination.  The fact that Westwood's explanation shifted over time could allow a jury to reasonably conclude that the various "proffered explanation[s] w[ere] not the true motivating explanation[s]."  *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1121, 1124 (8th Cir. 2006) ("At her termination, no one from the Company suggested that performance factored into the termination decision.  Nevertheless, in these proceedings, the Company raises performance issues as a . . . non-retaliatory motive for Ms. Wallace's termination. . . . While these factors might provide evidence of a non-retaliatory motive, a jury could reasonably infer that the Company's after-the-fact reliance on these facts is evidence that the Company is dissembling to cover

up an impermissible motive."), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.[12]

### 2.      No Factual Basis

Beito has also presented evidence that creates a material issue of fact as to whether Westwood's stated reasons for termination are pretextual.[13]  As an initial matter, the

---

[12] Westwood argues that its explanation did not shift because all of the reasons given at various points following Beito's termination relate to her poor job performance.  (*See* Def.'s Reply at 4.)  But at no point did Westwood state that its reason for Beito's termination was her poor performance.  Therefore, this is not a case where the employer is simply "elaborat[ing] on the same explanation."  *See Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006). Instead, following Beito's termination Westwood has proffered very specific reasons for her termination.  Although some of these reasons relate to Beito's performance, at various points following her termination Westwood has offered entirely new and different explanations of what that poor performance may have related to and offered other rationale for why she was terminated.  Westwood identified specific issues with Beito's performance that it gave as reasons for her termination at the initial termination.  Westwood then identified new, unrelated issues – such as Beito changing her work hours and filing a workers' compensation claim – that were added as reasons for termination in response to the unemployment commission.  In response to the EEOC charge, Westwood again reframed the reasons for Beito's termination citing, for example, her refusal to use an electronic time card system.  Therefore, a reasonable jury could properly consider the evidence of Westwood's shifting explanation as supporting a finding of pretext.

[13] The Court focuses its discussion here on the reasons for termination that Westwood actually discussed in its brief.  With respect to several of the stated reasons for termination given on Mike's nineteen-point list, for which Westwood provided no explanation or evidence in its brief Westwood has failed to "clearly set forth, through the introduction of admissible evidence, the reasons for" Beito's termination.  *See Burdine*, 450 U.S. at 255.  For example, Westwood contends that it terminated Beito because she "[d]idn't let employees talk to residents," "[f]ailed to correct employee negligence problems" and "[d]elegated her duties to others without consulting or notifying owners."  (Third Parra Decl., Ex. 14.)  But Westwood did not offer any evidence regarding this conduct and by failing to discuss these incidents in its brief have failed "to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext," as required to fulfill its burden of demonstrating a legitimate, nondiscriminatory reason for termination.  *See Burdine*, 450 U.S. at 255-56.

Additionally, with respect to many of the other stated reasons for termination given by Westwood at various points not included in its brief, Beito has demonstrated that the reasons lack

(Footnote continued on next page.)

Court notes that, taking all inferences in Beito's favor at this summary judgment stage, Beito need only present evidence that would allow a reasonable jury to conclude that some of the stated reasons for her termination were pretext for illegal discrimination.  In other words, even if a few of the reasons for termination provided by Westwood at various points have some basis in fact, that would not prevent a jury from concluding that Beito's termination was the result of discrimination on the basis of age, because Mike specifically testified that none of the reasons given "were specifically designed to say that we fired her because of that reason."  (M. Gorra Dep. 133:25-134:3.)  Therefore, viewing the facts in the light most favorable to Beito, a jury could conclude that Mike's list of nineteen reasons was intended to be an explanation of the cumulative errors that led to Beito's termination.  (*See id.* 120:13-15 (explaining with respect to one of the reasons for termination that the reason "by itself wouldn't have got her terminated, but that along with these other 18 did").)  If a jury concluded that several of the proffered reasons were false, it could reasonably conclude that the reasons for termination as a whole were pretext for illegal discrimination because Mike had testified that he relied on each of those reasons in combination to reach the ultimate decision to terminate Beito.  Therefore, the Court notes that the discussion which follows is intended to be

_____

(Footnote continued.)

a basis in fact.  For example, Mike himself testified that he was unaware of any employees who failed to report a concern of maltreatment because of Beito, although he claimed that she prevented employees from reporting maltreatment as a basis for termination.   Beito also presented evidence that she was never asked to provide a list of diabetic clients to dietary staff, that she typically worked from 8:00 a.m. to 5:00 or 5:30 p.m., which was within the hours expected of her, that she answered the telephone when possible, and that the occupancy rate was at an all-time high at Westwood during her tenure as manager.

representative of the types of conclusions a jury could reach with regard to the primary reasons for termination discussed by Westwood, not an exhaustive dissection of the reasons for termination offered.

With respect to the stated reason that Beito failed to maintain up-to-date resident service plans, Beito has presented evidence that, if believed, would allow a jury to conclude that Westwood did not "in good faith believe[] that [Beito] was guilty of the conduct justifying discharge." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) (internal quotation marks omitted).  Westwood presented evidence of a few instances of discrepancies between doctors' orders and service plans that Melby discovered in July 2011.  But after these discrepancies were brought to Beito's and Lehrke's attention, the record reflects no further issues regarding the accuracy of resident service plans (with the exception of billing, which the Court will discuss below).  Although Westwood claimed that this was a basis for termination, it did not terminate Beito until over a year after the discrepancies were discovered and resolved, suggesting that a jury could conclude that Mike did not believe this issue was truly a justification for termination.  Additionally, although Lehrke was responsible for generating resident service plans, she was not disciplined or terminated for the alleged inaccuracies in the plans.

In its brief Westwood also maintains that Beito was fired for failing to take action to enable Westwood to bill for customized living services.  But the record contains numerous factual disputes regarding Beito's role with respect to Westwood's struggles in transitioning to billing on the basis of customized services, upon which a jury could

conclude that this reason for termination has no basis in fact. Specifically, Beito testified that after the state made the switch from billing flat fees to allowing assisted pay clients to be billed pursuant to a customized billing program in 2006 she advised Mike several times about the ability to change Westwood's method of billing. Beito also testified that Mike indicated he did not want to change Westwood's billing procedures. Both Beito and Rick testified that without the Gorras' approval, Beito could not unilaterally change Westwood's rate structure. Therefore, to the extent the stated reason for termination relates to Beito's alleged failure to start the process of customized billing sooner than 2011, a jury could conclude that this rationale has no basis in fact as Mike's failure to approve a change in Westwood's rate structure prevented Beito from beginning that process.

It is undisputed that Beito did become aware of Mike's desire to transition to a fee-for-services billing model in August 2011 when she received the directive to "develop cost list (with assistance of nurse) for service to be offered, and now offered, by Westwood." (Second Taber Aff., Ex. K at 59.) To the extent the stated reason for Beito's termination was due to her failure to adequately undertake this directive, the Court concludes that the record contains sufficient facts upon which a jury could conclude that Beito did undertake that directive. Beito drafted a letter to the County in September 2011 regarding the transition in billing, developed a cost list, and made efforts to contact the County. Additionally, the record reflects that Beito drafted a letter to private pay residents regarding a change in fee structure, but was directed not to send the letter until negotiations were completed with the County, suggesting that the delay in

implementing a transition in fee structure was not attributable to Beito.  Beito also presented evidence that, even though Melby began contacting the County in September or October 2011, she was unable to actually transition to billing on a fee-for-service basis until the late summer or early fall of 2012 after Beito's termination, also suggesting that the delay in implementing a transition in fee structure was related to the County's non-responsiveness and not Beito's performance, as Melby's ability to obtain prompt results from the County was similarly poor.  Furthermore, Westwood presented evidence that Melby allegedly discovered an error in a service plan that failed to use a fee-for-services model.  But this alleged error was discovered in February 2012 – before Westwood had switched to a fee-for-services billing model for either assisted or private pay clients.  An additional error was allegedly discovered in an assisted pay resident's service plan in May 2012, but the record reflects that Westwood did not switch to fee-for-services billing for assisted pay clients until after Beito's termination.  Therefore, a jury could conclude that Mike did not truly believe that Beito was not performing her job by failing to use a billing system that Westwood had not yet adopted.

As for the stated reason that Beito failed to support implementation of Lifestyle Ledger, the record also contain disputed facts that would allow a jury to conclude the stated reason was pretext for illegal discrimination.  Beito presented evidence that the Westwood staff as a whole experienced frustrations using the software.  Melby herself testified that the initial rollout of the software was fraught with difficulty due to Westwood's internet connection.  Therefore, a reasonable jury could conclude that Beito's perceived uncooperativeness when she voiced her concerns about the software to

Melby was not an actual basis for termination because other staff voiced the same frustrations and the record contains ample evidence of the problems that plagued Lifestyle Ledger.  Additionally, to the extent the reason for termination was based on Beito's continued reliance on paper charts as backup after the beta testing of Lifestyle Ledger began, a reasonable jury could conclude that Mike did not believe this to be misconduct on Beito's part in light of the Agreement which specifically instructed Westwood "to safeguard important data, to use caution and not to rely in any way on the correct functioning or performance of the software and/or accompanying materials" and not to "rely exclusively on the software for any reason."  (Third Parra Decl., Ex. 6 at 2-3.) Furthermore, the record reflects that by the summer of 2012 – prior to Beito's termination, Melby consistently complimented Westwood staff and noted excellent improvements in using Lifestyle Ledger and moving away from paper charting.  The fact that Beito was fired after the issues with Lifestyle Ledger were resolved, could lead a reasonable jury to conclude that Mike did not "honestly believe[] the asserted grounds" for termination. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934-35 (8th Cir. 2006).

With respect to the stated reason for termination that Beito allowed two resident accounts to become considerably overdue, a reasonable jury could also conclude that Mike did not actually believe this was a reason for termination.  First, Beito presented evidence that Westwood employs a bookkeeper who is responsible for recording and depositing resident rent, maintaining a list of overdue accounts, and reports to Rick accounts that are in arrears every month.  Therefore, a jury could conclude that Mike did not actually believe Beito was responsible for reporting overdue accounts to the Gorras.

Beito also testified that both overdue accounts were related to routine delays with estate issues and medical assistance applications, suggesting that the arrearages were normal occurrences in Westwood's business and Mike did not honestly believe she was responsible for allowing the arrearages to accrue.

As for the stated reason of two resident care incidents, the Court similarly finds that material issues of fact remain.  Westwood claims that it terminated Beito in part for failing to use Wanderguard on the resident that fell in the parking lot.   But Beito presented evidence that Westwood's Wanderguard system was not operational because it did not include a door tester.   Accordingly, a jury could conclude that this reason for termination has no basis in fact.   The description of the second incident in which a resident broke her arm contains sufficient disputed facts regarding the doctor's order and the necessary level of assistance required by the resident upon which a jury could conclude that Mike did not actually believe the incident was due to Beito's performance instead of the result of the employee's conduct who was tasked with assisting the resident or accidental causes.    Because a jury could reasonably conclude that many of the stated reasons for Beito's termination lack a basis in fact or were not honestly considered by Mike to be offenses warranting termination, a jury could conclude that the stated reasons as a whole were pretext for unlawful discrimination.

### 3.      Evidence of Age Discrimination

Finally, Beito has presented circumstantial evidence of comments and practices that suggest a preference for younger employees, sufficient to satisfy the second step of a pretext showing for her age discrimination claims.  Mike testified that Beito could have

remained working at Westwood until she was 110 if she had been doing her job, "because she looked good" and "a lot younger" than her age. (M. Gorra Dep. 88:12-16, 89:3-4.) A reasonable jury could conclude based on this comment that Mike had a preference for younger employees – or employees that looked young. Additionally, during the beta testing of Lifestyle Ledger Melby questioned Beito's ability to learn, made degrading statements about Beito's competence, and commented that "younger staff caught on more quickly" than Beito. (Beito Dep. 79:4-13.) Furthermore, Beito testified that Rick continued to ask her about whether she planned to retire numerous times after she had informed him that the Gorras would be the first to know if she had such plans. Rick and his wife also told Beito that it would be "stupid" for Mike to fire her, because she could file an age discrimination lawsuit.

Although Melby and Rick were not decisionmakers, their comments are still relevant to the jury's inquiry. These comments, taken as a whole, would permit a reasonable jury to conclude that a pervasive attitude of age discrimination – or a preference for younger employees – existed at Westwood and influenced Mike's decision. *See Ryther v. KARE 11*, 108 F.3d 832, 842-43 (8th Cir. 1997) (finding that a jury could reasonably conclude that a decisionmaker "formed her judgment about [plaintiff] on the basis of the discriminatory comments frequently made by" non-decisionmakers, where non-decisionmakers had "frequent discussions" with the decisionmaker about plaintiff's "ability to 'grasp' some of the 'newer' developments at the station" along with evidence that the decisionmaker "was generally responsive to [the non-decisionmaker]'s ideas and demands"). It is undisputed that Melby spoke with Mike

frequently about Beito's alleged performance issues and had also expressed that Beito had a more difficult time than the younger employees learning to use Lifestyle Ledger.  It is also undisputed that Mike often was responsive to Melby's ideas and demands as her criticisms of Beito resulted in written directives.  Furthermore, in light of the small staff at Westwood and Rick's relationship to Mike, a jury could reasonably infer that Mike was aware of Rick's discussions with Beito regarding retirement and her age.  Rick's persistent questioning about retirement, while not alone sufficient to demonstrate age discrimination, is an additional piece of evidence from which a jury could conclude that the company engaged in unlawful discrimination.  *See Montgomery v. John Deer & Co.*, 169 F.3d 556, 560 (8th Cir. 1999) ("[T]he fact that Montgomery was regularly offered early retirement does not by itself violate the ADEA. . . . However, retirement inquiries can sometimes be so unnecessary and excessive as to constitute evidence of discriminatory harassment.").[14]

---

[14] Melby's comment could also be relevant under a cat's paw theory of discrimination which is appropriate in "a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Qamhiyah v. Iowa State Univ. of Science & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) (internal quotation marks omitted).  Under this theory "an employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." *Id.* (internal quotation marks omitted). In determining whether comments of a subordinate can be attributed to the adverse employment action the relevant inquiry is whether the decisionmaker "served as the conduit, vehicle, or rubber stamp by which another achieved his or her unlawful design." *Id.* at 745 (alterations and internal quotation marks omitted).  In other words, to proceed on a cat's paw theory, a plaintiff must raise a genuine issue of material fact as to whether the subordinate's discriminatory animus was a "proximate cause of [plaintiff]'s firing." *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011).  Here, Beito has presented sufficient evidence to create a genuine issue of material fact as to Melby's influence over Mike in the decision making process, and whether Melby's belief that younger employees were better was the proximate cause of Beito's termination.  For example, the record reflects that Beito worked for Westwood for over twenty-

(Footnote continued on next page.)

In addition to the comments, Beito presented evidence that she was replaced as manager by substantially younger employees.  Finally, the record reflects that although Beito had engaged in much of the alleged misconduct described on Mike's list of nineteen reasons as early as the 1990s and many years prior to her termination in 2012 (such as changing her work hours and Westwood's damage deposit policy), she was not disciplined for this conduct in any manner until she was terminated in 2012 – when she was almost two decades older.   In light of this evidence, in addition to the comments by Mike, Melby, and Rick, and the strong evidence of pretext presented, the Court finds that a reasonable jury could conclude that age was a determinative factor in Beito's termination.   Accordingly, the Court will deny Westwood's motion for summary judgment.

This case will be placed on the Court's next available trial calendar.

_____

(Footnote continued.)

two years without a single documented performance-related incident prior to the introduction of Lifestyle Ledger and Melby to Westwood.  Almost immediately after Melby began the beta testing she repeatedly brought her concerns about Beito to Mike's attention.  In fact, the only conduct of Beito's that resulted in written directives from Mike was conduct reported to him by Melby, and many of the concerns expressly raised by Melby formed the alleged basis of Mike's termination decision.  Additionally, a jury could conclude that Melby and her belief that Beito was too old to perform her job, influenced the termination decision because she became increasingly involved in the operations of Westwood, was appointed interim manager after Beito's termination, and was actively involved in hiring the next two managers, suggesting that Melby had considerable influence in Mike's decision making.  Accordingly, a jury could properly consider Melby's statement that younger employees learned more quickly than Beito in determining whether age was a determinative factor in Beito's termination.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 29] is **DENIED**.

DATED:  July 8, 2014                                    ___s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                    JOHN R. TUNHEIM
                                                      United States District Judge